**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED AERONAUTICAL
CORPORATION; BLUE
AEROSPACE, LLC,

*Plaintiffs-Appellants*,

v.

UNITED STATES AIR FORCE;
UNITED STATES AIR NATIONAL
GUARD,

*Defendants-Appellees*,

No. 21-56377

D.C. No.
2:20-cv-01985-
ODW-JDE

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted December 9, 2022
Pasadena, California

Filed September 7, 2023

Before: MILAN D. SMITH, JR., DANIEL P. COLLINS,
and KENNETH K. LEE, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Collins

# SUMMARY[*]

## Contract Disputes Act / Jurisdiction

The panel affirmed the district court's dismissal for lack of subject-matter jurisdiction of an Administrative Procedure Act (APA) action brought by United Aeronautical Corporation and Blue Aerospace, LLC (collectively, Aero) against the U.S. Air Force and U.S. Air National Guard (collectively, USAF) alleging that USAF improperly used Aero's intellectual property—data relating to the Mobile Airborne Firefighting System (MAFFS)—in violation of federal procurement regulations and the Trade Secrets Act.

Aero delivered a hard drive containing MAFFS-related data to the United States Forest Service and executed a Data Rights Agreement (DRA) granting the Forest Service "unlimited rights to view and use" the data. The Forest Service delivered that hard drive to USAF, and Aero sued USAF for its receipt and use of the MAFFS data.

The APA waives sovereign immunity for actions in federal district court by persons suffering legal wrong because of agency action; however, when a statute vests exclusive jurisdiction over a category of claims in a specialized court, it "impliedly forbids" an APA action in district court.

The panel agreed with the district court that the Contract Disputes Act "impliedly forbids" jurisdiction over Aero's claims by vesting exclusive jurisdiction over federal-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contractor disputes in the Court of Federal Claims. A claim falls within the scope of the CDA's exclusive grant of jurisdiction if (1) the plaintiff's action relates to (2) a procurement contract (3) to which the plaintiff was a party. Here, Aero's claims that USAF improperly received and used MAFFS data (1) relate to the DRA, (2) the DRA is a procurement contract, and (3) Aero is a contractor for purposes of the DRA.

The panel held that the test set forth in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), is limited to determining whether the Tucker Act—which grants exclusive jurisdiction to the Court of Federal Claims over breach-of contract actions for money damages—"impliedly forbids" an ADA action because *Megapulse* addressed implied preclusion only pursuant to the Tucker Act, not pursuant to the CDA.

Dissenting, Judge Collins would reverse the district court's dismissal for lack of subject-matter jurisdiction, and hold that the CDA does not "impliedly forbid" Aero from bringing an APA action because Aero's claims are not based on a government contract, but instead on Aero's independent statutory rights under the Trade Secrets Act.

## COUNSEL

David M. Almaraz (argued), Grant Shenon APLC, Sherman Oaks, California; Jonathan R. Hickman, Esquire Corporate Services LC, Encino, California; for Plaintiffs-Appellants.

Paul B. Green (argued) and Joanne S. Osinoff, Assistant United States Attorneys; David M. Harris, Assistant United States Attorney, Civil Division Chief; Tracy L. Wilkison, United States Attorney; United States Attorney's Office, Los Angeles, California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

United Aeronautical Corporation and Blue Aerospace, LLC (collectively, Aero) filed suit against the United States Air Force and Air National Guard (collectively, USAF) in the U.S. District Court for the Central District of California. Aero alleges that USAF has for some time violated federal procurement regulations and the Trade Secrets Act, 18 U.S.C. § 1905, by improperly using Aero's intellectual property. The district court dismissed for lack of subject-matter jurisdiction, concluding that the Contract Disputes Act (CDA), 28 U.S.C. § 1491(a)(2), precludes jurisdiction over Aero's action by vesting exclusive jurisdiction over federal-contractor disputes in the Court of Federal Claims. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation relates to the Mobile Airborne Firefighting System (MAFFS): an anti-retardant tank system

that converts cargo planes so that they can combat fires.[1] From about 1980 to 2000, Aero Union—a different company than the plaintiffs in this case—developed the original MAFFS. In 2000, Aero Union contracted with the U.S. Forest Service to develop an updated MAFFS prototype (MAFFS II), which incorporated significant amounts of Aero Union's intellectual property that was developed from 1980 to 2000.

In 2012, Aero—the plaintiffs in this case—purchased Aero Union's intellectual property in a foreclosure sale. In 2014, to support the Forest Service's continued use of MAFFS II, Aero delivered a hard drive containing MAFFS-related data to the Forest Service and executed a Data Rights Agreement (DRA) providing:

> "[A]s set forth in [2000 Contract between Aero Union and the Forest Service], the technical data produced or specifically used or related to [MAFFS II] developed pursuant to such contract shall remain the property of [Aero] (as the purchaser of assets of Aero [Union] . . . ) and [the Forest Service] shall have ***unlimited rights to view and use the data required for the continued operation***

---

[1] For purposes of this appeal, we accept Aero's allegations as true because USAF's motion to dismiss for lack of subject-matter jurisdiction raised a *facial*, not factual, challenge. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

> *and   maintenance   of   [MAFFS   II]*"
> (emphasis added).

Thereafter, the Forest Service delivered that hard drive to USAF, which developed an upgraded system (iMAFFS) and marketed that system internationally.

Aero sued USAF, not the Forest Service, for its receipt and use of the MAFFS data.  Specifically, Aero brought a claim pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, alleging that USAF had violated and continues to violate federal procurement regulations and the Trade Secrets Act.  USAF moved to dismiss, arguing that the CDA vests exclusive jurisdiction over federal-contractor disputes in the Court of Federal Claims.  The district court granted the motion with leave to amend.  Aero filed an amended complaint; USAF again moved to dismiss; and the district court granted the motion, this time without leave to amend.  Aero timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review a district court's dismissal for lack of subject-matter jurisdiction de novo.  *Dogan v. Barak*, 932 F.3d 888, 892 (9th Cir. 2019).

## ANALYSIS

The district court correctly held that it lacked subject-matter jurisdiction over Aero's action.  A private party may sue the United States only if the United States has waived sovereign immunity.  *Esquivel v. United States*, 21 F.4th 565, 572 (9th Cir. 2021).  If the United States has not waived sovereign immunity, then the court where the suit is filed

must dismiss the case for lack of subject-matter jurisdiction. *Id.* at 572–73.

The APA waives sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. That waiver, however, is subject to three limitations: (1) the plaintiff must "seek[] relief other than money damages"; (2) the plaintiff must have "no other adequate remedy"; and (3) the plaintiff's action must not be "expressly or impliedly forbid[den]" by "any other statute." *See id.* §§ 702, 704; *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998). Where a statute vests exclusive jurisdiction over a category of claims in a specialized court (*e.g.*, the Court of Federal Claims), it "impliedly forbids" an APA action brought in federal district court. *See Tuscon Airport*, 136 F.3d at 646; *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (per curiam).

This appeal concerns only the third limitation: The parties dispute whether the CDA forbids Aero from maintaining its APA claim in district court because it falls within the category of claims that the CDA requires to be litigated in the Court of Federal Claims.**[2]** We hold that it

---

[2] Aero also brought a claim pursuant to the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201. The DJA "does not 'extend' the 'jurisdiction' of the federal courts." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). A DJA claim, therefore, "may not be used as an end run around" the limits of the APA's sovereign-immunity waiver. *See Alaska Dep't of Nat. Res. v. United States*, 816 F.3d 580, 586 (9th Cir. 2016) (citing *McMaster v. United States*, 731 F.3d 881, 900 (9th Cir. 2013)). Because the availability of Aero's DJA claim depends on the availability of its APA claim, we need only analyze the latter.

does and affirm the district court's dismissal for lack of subject-matter jurisdiction.

## I. The CDA "impliedly forbids" jurisdiction over Aero's claims

The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts: Federal contractors can submit written claims to agency contracting officers, receive written decisions regarding their claims within a specified timeframe, and administratively appeal adverse decisions. *See* 41 U.S.C. §§ 7101–7109. Second, it waives sovereign immunity over actions "arising under" that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency boards of contract appeals, 41 U.S.C. §§ 7104(a), 7105. A litigant can appeal the decision of either the Court of Federal Claims or an agency board to the U.S. Court of Appeals for the Federal Circuit. U.S.C. § 1295(a)(3), (b); 41 U.S.C. § 7107(a)(1).

Through § 1491(a)(2)'s "arising under" language, the scope of the CDA's sovereign-immunity waiver and jurisdictional grant is expressly tied to the scope of the administrative system that it creates. This grant broadly extends to "dispute[s] concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of [a government] contracting officer has been issued." 28 U.S.C. § 1491(a)(2).

Because the scope of the CDA's administrative system dictates the scope of the CDA's "arising under" jurisdictional grant, we look to the contours of the

administrative system to determine whether a particular claim is covered by the CDA and thus must be litigated in the Court of Federal Claims.  First, the CDA applies to "claim[s] . . . *relating to* a contract." 41 U.S.C. § 7103(a)(1) (emphasis added).  Second, the CDA applies only to claims involving a "contractor," which is "a party to a Federal Government contract other than the Federal Government." *Id.* §§ 7101(7), 7103(a)(1); *see also* 28 U.S.C. § 1491(a)(2) (limiting jurisdiction to "any claim by or against, or dispute with a contractor").  Third, as relevant here, the CDA applies to contracts for "the procurement of property, other than real property in being." 41 U.S.C. § 7102(a)(1).

So, to summarize: a claim falls within the scope of the CDA's exclusive grant of jurisdiction if (1) the plaintiff's action "relat[es] to" (2) a procurement contract (3) to which the plaintiff was a party.  Aero's action meets each requirement, and thus the CDA "impliedly forbids" it.

## A.  Aero's APA action "relat[es] to" the DRA

First, we must examine whether Aero's claim "relat[es] to" a contract.  41 U.S.C. § 7103(a)(1).  We have not previously construed the CDA's "relating to" requirement. USAF urges us to follow a Federal Circuit decision on a related question and hold that a claim "relat[es] to" a contract, and thus falls within the scope of the CDA, if it "ha[s] some relationship to the terms or performance" of the contract. *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011) (quoting *Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998)).

We find the Federal Circuit's reasoning to be persuasive and adopt it here.  In *Todd,* the Federal Circuit reasoned that Congress's "overall purpose to confer comprehensive jurisdiction under the CDA" in the Court of Federal Claims

counsels in favor of broadly interpreting "relating to."  *Id.* at 1311–12; *see also United States v. Suntip Co.*, 82 F.3d 1468, 1474 (9th Cir. 1996) ("The intent behind [the CDA] is to confine these government contract disputes to expert tribunals created expressly for that purpose.  That intent is defeated if a contracting party may . . . compel the government to litigate the merits of its contracting officers' decisions in district court.").  It then turned to dictionary definitions, finding that they treat "relating to" as a "term of substantial breadth."  *Todd*, 656 F.3d at 1312.  Finally, it looked to Supreme Court precedent broadly interpreting "related to" in other statutes, including in a similar jurisdiction-conferring provision.  *Id.*   The *Todd* court soundly applied traditional tools of statutory interpretation, and we see no reason to depart from the result it reached.  Indeed, Aero concedes that *Todd Construction* "properly analyzed" this "relating to" language.

To be sure, *Todd* presented a slightly different question.  Here, we are tasked with interpreting the *statutory* phrase "claim . . . *relating to* a contract."  41 U.S.C. § 7103(a)(1) (emphasis added).   *Todd*, on the other hand, construed *regulatory* language that interpreted "claim," as used in the above phrase and throughout the CDA.  656 F.3d at 1311.  That regulation defined a "claim" as "a written demand . . . seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or *relating to* the contract."  48 C.F.R. § 2.101 (emphasis added).  The "relating to" phrase in the statute and regulation is the same, but the phrase modifies different words in the two settings.  In the CDA, "relating to" modifies "claim."  In the regulation, it modifies "relief."

The dissent argues that we should make the relief sought the focal point of our "relating to" analysis—instead of asking whether a plaintiff's cause of action more generally "relat[es] to" a contract. We need not decide in this case which is the proper focal point: the cause of action generally or the relief sought specifically. Here, our analysis under both leads to the same result.

Starting with Aero's cause of action generally, it has "some relationship to the terms or performance" of the DRA. *Todd*, 656 F.3d at 1312 (quoting *Applied Cos.*, 144 F.3d at 1478). Aero brings an APA claim that USAF acted contrary to law by violating the Trade Secrets Act. That Act, in turn, simply prohibits government employees from disclosing trade secrets "in any manner or to any extent not authorized by law." 18 U.S.C. § 1905. Therefore, the merits of this case will, among other things, require a court to interpret the DRA and determine whether the Forest Service was authorized by that agreement's "unlimited rights to view and use" clause to disclose the MAFFS data to USAF.

Turning specifically to the relief that Aero sought, that too has "some relationship to the terms or performance" of the DRA. *Todd*, 656 F.3d at 1312 (quoting *Applied Cos.*, 144 F.3d at 1478). Aero, among other things, seeks a declaration that the United States government generally "has no ownership rights" in the MAFFS data and that USAF does "not have the right to use" the MAFFS data "to develop the iMAFFS system for . . . procurement to the international market." It blinks reality to argue that this requested relief lacks "some relationship" to the DRA's "unlimited rights to view and use" clause. Such a declaration, which defines the scope of the government's MAFFS-data use rights,

necessarily relates to the DRA, which grants the Forest Service "unlimited rights to view and use" MAFFS data.[3]

## B.  The DRA is a procurement contract

Second, we must examine whether the contract at issue is one for "the procurement of property, other than real property in being." 41 U.S.C. § 7102(a)(1).  USAF contends that, through the DRA, it procured a property right in the form of "unlimited rights to view and use" Aero's purported trade secrets.  Aero's argument comports with the statutory text of the CDA, which extends the Court of Federal Claims' jurisdiction to "dispute[s] concerning rights in . . . *intangible* property."   28 U.S.C. § 1491(a)(2) (emphasis added).  Moreover, it finds support in the Supreme Court's decision in *Ruckelshaus v. Monsanto Co.* 467 U.S. 986, 1000–04 (1984), where the Court held that trade secrets constitute "property" for purposes of the Takings Clause.[4]

Aero responds to USAF's argument by analogizing the DRA to a bailment contract, which one Court of Federal Claims decision suggests does not constitute a procurement contract covered by the CDA.  *See Telenor Satellite Servs., Inc. v. United States*, 71 Fed. Cl. 114, 119 (2006) ("The

---

[3] The district court stopped its analysis here.  By declining to consider whether Aero is a contractor and whether the DRA is a procurement contract, the district court erred.  However, that error was harmless: As explained below, Aero's action also fits the CDA's second and third jurisdictional requirements.

[4] We recognize that an interest can sometimes constitute property for constitutional purposes but not statutory ones.  *See, e.g.*, *Shulman v. Kaplan*, 58 F.4th 404, 408, 410–12 (9th Cir. 2023) (holding that plaintiff sufficiently pleaded a cannabis-related injury to property for Article III standing but not for RICO statutory standing).  But here, there is no "statutory purpose or congressional intent," *id.* at 410, behind the CDA that warrants a departure from *Ruckelshaus*'s treatment of trade secrets.

parties agree that this case is not governed by the Contract Disputes Act because it does not involve a contract for the procurement of goods or services. Rather, it involves an alleged bailment contract for the possession and use of certain electronic transmission equipment."). We are not persuaded by this analogy. To begin, Aero does not discuss whether bailment (the granting of possession of personal property to another for a temporary amount of time) applies to intellectual property. But more critically, Aero does not allege that it only *temporarily* granted intellectual property rights to the Forest Service—an essential element of bailment under the case law it cites. *See Telenor*, 71 Fed. Cl. at 119 (bailment relationship "includes a return of the goods to the owner" (quotation omitted)).

### C. Aero is a contractor for purposes of the DRA

Third, we must examine whether Aero is a "contractor," which the CDA defines as "a party to a Federal Government contract other than the Federal Government." 41 U.S.C. § 7107(7). As the only party to the DRA other than the Forest Service, Aero is clearly a contractor.

* * *

Because Aero's action satisfies each of the prerequisites of the CDA's exclusive-jurisdiction provision and sovereign-immunity waiver, we hold that the CDA "impliedly forbids" Aero from invoking the otherwise-applicable waiver of sovereign immunity contained in the APA.

### II. The *Megapulse* test for implied preclusion pursuant to the Tucker Act does not apply to the CDA

Aero resists dismissal by arguing that *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), requires that its claim

may be brought in district court. The *Megapulse* test, however, is limited to determining only whether the Tucker Act, *not* the CDA, "impliedly forbids" an APA action. The CDA was not yet in effect when the parties in *Megapulse* contracted with each other. And while the Tucker Act and CDA share a common core, each statute confers a distinct grant of exclusive jurisdiction to the Court of Federal Claims. *See Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1372–73 (Fed. Cir. 2009). Courts, therefore, must separately analyze whether each statute "impliedly forbids" an APA action. We use the *Megapulse* test to determine implied preclusion pursuant to the Tucker Act, but we use the analysis conducted above to determine implied preclusion pursuant to the CDA. Here, we need not decide whether Aero satisfies the Tucker Act's *Megapulse* test because, even if it does, the CDA still "impliedly forbids" bringing this action in federal district court.

The Tucker Act dates back to the late nineteenth century, *see* Tucker Act, ch. 359, § 1, 24 Stat. 505, 505 (1887), and in its current form provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States*." 28 U.S.C. § 1491(a)(1) (emphasis added). "Generally speaking, the Tucker Act does not permit the [Court of Federal Claims] to grant equitable or declaratory relief." *N. Star*, 9 F.3d at 1432; *see* 28 U.S.C. § 1491(a)(2) (listing limited forms of non-monetary relief the Court of Federal Claims may award "as an incident of and collateral to" damages). Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks

*money damages* for the breach of a government contract. *See, e.g.*, *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364–65 (Fed. Cir. 2021).

Therefore, we interpret the Tucker Act to "impliedly forbid" an APA action seeking injunctive and declaratory relief only if that action is a "disguised" breach-of-contract claim. *Megapulse*, 672 F.2d at 968. To determine whether that is the case, we use a two-part test derived from the D.C. Circuit's *Megapulse* decision, which looks to (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003) (quoting *Megapulse*, 672 F.2d at 968); *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994) (same). If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief. This test imposes something akin to a well-pleaded complaint rule for Tucker Act-adjacent APA actions. The Tucker Act does not bar an APA action if the plaintiff's rights and remedies, as alleged, are noncontractual—even if it is inevitable that the government will raise a contract provision as a defense. *Cf. City of Oakland v. BP PLC*, 969 F.3d 895, 903 (9th Cir. 2020) (explaining that federal-question jurisdiction's well-pleaded complaint rule "depends solely on the plaintiff's claims for relief and not on anticipated defenses to those claims" (quotation omitted)).

*Megapulse* involved facts similar to this case. The plaintiff brought an APA action alleging that the Coast Guard violated its intellectual-property rights and sought injunctive relief preventing further disclosure. 672 F.2d at 961–63. The merits inevitably turned on an intellectual-

property licensing clause in a contract between the plaintiff and the Coast Guard.  *See id.* at 961.  Nonetheless, the court held that the plaintiff's rights were derived not from the contract but from the Trade Secrets Act and that the relief sought (an injunction preventing disclosure) was not akin to the traditional remedies available for breach of contract (damages or specific performance).  *Id.* at 968–970.  As such, the Tucker Act did not "impliedly forbid" the plaintiff's APA action brought in district court.

Aero relies on *Megapulse* to argue that the district court has jurisdiction here because (1) its rights come but from federal procurement regulations and the Trade Secrets Act, not the contract; and (2) it seeks injunctive relief preventing further use of its intellectual property and a declaration that the USAF lacks any rights to the MAFFS data, not the breach-of-contract remedies of money damages or specific performance.  USAF contends that this case is distinguishable from *Megapulse* because the plaintiff in that case developed its proprietary data before entering into any government contract and requested quite limited injunctive relief (return of only six documents).  *See Megapulse*, 672 F.2d at 966.

We need not decide whether these differences warrant a different jurisdictional decision pursuant to the Tucker Act's *Megapulse* test.  That decision addressed implied preclusion only pursuant the Tucker Act; it did not consider implied preclusion pursuant to the CDA.  Indeed, the contracts at issue in *Megapulse* were not subject to the CDA.  The last contract in that case was formed in 1975, *id.* at 399–400, but the CDA applies only to contracts formed after 1978, and a key amendment to the CDA did not take effect until 1992, *see* 28 U.S.C. § 1491 *notes* (effective dates of 1978 and 1992 amendments).

Congress passed the CDA in 1978, adding subsection 1491(a)(2)'s second sentence that originally read: "The Court of Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under the Contract Disputes Act of 1978." Pub. L. No. 95-563, § 14(i), 92 Stat. 2383, 2391; *Todd Constr. L.P. v. United States*, 85 Fed. Cl. 34, 38–39 (2008). Following the addition of this language, there was confusion about the availability of declaratory relief pursuant to the CDA. *See Todd*, 85 Fed. Cl. at 39–40. A little over a decade later, Congress resolved this ambiguity when it passed the Federal Courts Administration Act of 1992, which further amended subsection 1491(a)(2) to clarify that CDA jurisdiction encompasses "*nonmonetary* disputes." Pub. L. No. 102-572, § 907(b)(1), 106 Stat 4506, 4519 (emphasis added).

Given these legislative amendments, the court in *Megapulse* simply did not have the question before it that we do: whether the CDA's jurisdictional grant, separate from that of the Tucker Act, "impliedly forbids" application of the APA's sovereign-immunity waiver. Nor do we see any reason to adopt *Megapulse* as the test for determining whether the CDA precludes district court jurisdiction over an APA claim. The Tucker Act and CDA confer exclusive jurisdiction over different sets of claims, so they necessarily preclude different sets of APA claims—even if an implied-preclusion analysis pursuant to each will often lead to the same result.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over breach-of-contract actions for money damages. Therefore, the *Megapulse* test asks whether an APA action is simply a disguised breach-of-contract action.

The CDA, by contrast, grants exclusive jurisdiction to the Court of Federal Claims over actions "relating to" a procurement contract—some of which will look a lot like Tucker Act claims. But unlike the Tucker Act, the CDA also empowers the Court of Federal Claims to hear "nonmonetary dispute[s]" and issue declaratory relief therein. Therefore, to determine whether there is implied preclusion pursuant to the CDA, we must ask whether an APA action is a disguised CDA action. To do so, we employ the analysis conducted in the previous section that determines whether an APA litigant could bring a similar action pursuant to the CDA and obtain similar relief.

For the reasons explained in the previous section, Aero's action satisfies each of the criteria necessary to fall within the CDA's exclusive-jurisdiction provision and waiver of sovereign immunity. Indeed, had Aero exhausted its administrative remedies, it could have maintained a remarkably similar action in the Court of Federal Claims—substituting the Forest Service as a defendant.[5] Aero asks the district court to interpret its agreement with the Forest Service, evaluate whether the Forest Service's provision of the MAFFS data to USAF exceeded the use rights granted by the DRA, and grant injunctive and declaratory relief. The CDA authorizes federal contractors to submit claims "relating to" a government contract, 41 U.S.C. § 7103(a)(1)–(2); authorizes judicial review of agency decisions, *id.*

---

[5] USAF argues that dismissal for lack of subject-matter jurisdiction is alternatively appropriate because Aero failed to exhaust its administrative remedies pursuant to the CDA. Aero does not assert that it ever submitted a claim to a Forest Service contracting officer, as required by the CDA. In light of this concession and our holding that the CDA applies to Aero's action, dismissal was also proper on exhaustion grounds.

§ 7104(b)(1); incorporates standards of review similar to those of the APA, *id.* § 7107(b); and, as explained more fully below, empowers the Court of Federal Claims to issue declaratory relief, 28 U.S.C. § 1491(a)(2) (jurisdiction extends to "nonmonetary disputes"). The availability of such an action in the Court of Federal Claims "impliedly forbids" Aero from bringing its action in district court.

## III. The Dissent's Remaining Arguments Do Not Alter This Conclusion

The dissent offers several other arguments for why the CDA does not deprive the district court of jurisdiction over Aero's APA action, even though Aero could have brought a remarkably similar action in the Court of Federal Claims. None displaces the conclusion that we reached in this decision.

### A. The Well-Pleaded Complaint Rule Has No Bearing On Whether the United States Has Waived Its Sovereign Immunity

First, the dissent argues that our reading of the CDA "erase[s] the distinction between a claim and a defense," and thus cannot be squared with the well-pleaded complaint rule, which allows a plaintiff to avoid bringing a matter within the jurisdiction of a particular forum by limiting the types of claims it asserts. However, the well-pleaded complaint rule is an interpretation applicable to a single statute: 28 U.S.C. § 1331. We have long interpreted that provision to require that, for a court to be able to exercise its statutorily conferred federal-question jurisdiction, "a federal question [must] appear[] on the face of the complaint." *City of Oakland v. BP PLC*, 969 F.3d 895, 903 (9th Cir. 2020). Here, in assessing whether Aero's claims are of the type that fall within § 1331, we complied with the well-pleaded complaint

rule. By alleging violations of federal statutes and regulations pursuant to the APA's cause of action, Aero's complaint asserts a federal question and satisfies § 1331.

As the dissent acknowledges, § 702 of the APA does not provide "an independent basis for subject matter jurisdiction"—whether the federal courts are empowered to hear the type of claims that the plaintiff asserts. *Tucson Airport*, 136 F.3d at 645. Instead, that section provides a limited waiver of sovereign immunity—whether, and pursuant to what conditions, has the United States consented to be sued for a claim that is otherwise within a federal court's jurisdiction. Though the dissent recognizes this distinction, it fails to offer a good reason for exporting the well-pleaded complaint rule from the former context (federal-question jurisdiction) to the latter (waiver of sovereign immunity).

Indeed, the two inquires have very different background presumptions that counsel against the reflexive use of the well-pleaded complaint rule in sovereign-immunity analyses. Section 1331 analyses begin with a dual-sovereignty presumption: "Under [our] system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Because state courts and federal courts are, as a general matter, equally competent to adjudicate federal issues, we—when applying § 1331—defer to the plaintiff as "the master of the complaint" and allow him or her "to have [a] cause heard in state court" by "eschewing claims based on federal law." *See Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (citation omitted). In other words, our § 1331 analysis lets litigants choose where to bring a

claim (state or federal court) because each is competent to hear it.

Sovereign immunity analysis, on the other hand, begins with a presumption of government immunity: "An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity." *Esquivel*, 21 F.4th at 572 (citation omitted). "[I]t rests with Congress to determine not only whether the United States may be sued, but in *what courts* the suit may be brought." *McGuire v. United States*, 550 F.3d 903, 913 (9th Cir. 2008) (emphasis added) (quoting *Minnesota v. United States*, 305 U.S. 382, 388 (1939)). Waivers of sovereign immunity are, in turn, "construed strictly in favor of the sovereign." *McGuire v. United States*, 550 F.3d 903, 912 (9th Cir. 2008). Thus, where the government's waiver includes a limitation about "what courts" may hear a claim against it, we cannot defer to the plaintiff's choice of court; instead, we must "strictly" construe the waiver to effectuate Congress's limitation on it.

Our analysis of the APA's waiver followed the latter sovereign-immunity-specific approach—not the section-1331-specific approach that the dissent urges. The APA waives sovereign immunity over certain claims in district court unless "any other statute . . . impliedly forbids the relief which is sought." 5 U.S.C § 702. We held that the CDA "impliedly forbids" certain contract-related actions by requiring they be brought in the Court of Federal Claims or before an agency contracting board (with appellate review then before the Federal Circuit). A plaintiff cannot sidestep the "impliedly forbids" limitation on the APA's waiver of sovereign immunity through clever pleading.

### B.  Our Opinion Follows Circuit Precedent

Second, the dissent argues that our holding "ignores our prior caselaw."  However, our opinion is wholly consistent with the decisions that the dissent contends are contrary to our interpretation of the CDA as it currently stands.  The dissent quotes *Concrete Tie of San Diego Inc. v. Liberty Constr., Inc.*, 9 F.3d 800 (9th Cir. 1993) for the proposition that we have "'narrowly' construed" the "CDA's preclusive effect."  But that case concerned the pre-1992-amendment CDA's impact on jurisdiction conferred by the Small Business Act's sue-and-be-sued clause.  *See id.* at 801–02.  That case said nothing about how the availability of declaratory relief pursuant to the post-1992-amendment CDA affects whether an APA action is "impliedly forbid[den]."  *See* 5 U.S.C. § 702.  The other decision the dissent cites is to a similar effect—even stating that it was construing a "virtually identical" clause as *Liberty Construction* had.  *Wright v. U.S. Postal Serv.*, 29 F.3d 1426, 1430 (9th Cir. 1994).  In *Wright*, we once again considered the interaction of a sue-and-be-sued clause with the CDA.  *See id.*  Neither case, as this one did, discussed how the APA interacts with the CDA—a unique context given the former's implied-preclusion limit on its waiver.  These cases, therefore, are fully consistent with our decision.

### C.  Our Opinion Considers a Different Kind of Claim Than Sister-Circuit Precedent Has

Third, the dissent argues that our decision "creates a circuit split with at least four circuits that expressly apply *Megapulse* in assessing whether the CDA impliedly forbids reliance on the APA."  But the sister-circuit decisions that the dissent cites are, after further inspection, distinguishable.

If depicted as a Venn diagram, the Tucker Act and CDA's two circles would have a large common area. A classic Tucker Act action is a breach-of-contract claim for money damages. *E.g.*, *Boaz Hous. Auth.*, 994 F.3d at 1364–65. Similarly, CDA claims often involve the "seeking, as a matter of right, the payment of money in a sum certain" for the breach of a contract. 48 C.F.R. § 2.101. Thus, actions seeking damages for the breach of a contract would form a large common area in the Tucker Act–CDA Venn diagram. But each statute also covers ground that the other does not. On one side as the Federal Circuit explained in *FloorPro*, third-party beneficiary contractors can sue pursuant to the Tucker Act, while they cannot do so pursuant to the CDA. 570 F.3d at 1371–72. On the other side, as we explained here, the CDA generally allows declaratory relief in "nonmonetary disputes," while the Tucker Act authorizes declaratory relief only in limited circumstances. *See* 28 U.S.C. § 1491(a)(2).

Each of the sister-circuit decisions that the dissent cites falls within the large overlapping area of the Tucker Act–CDA Venn diagram and all involved claims that were easily-spotted breach-of-contract claims. The D.C. Circuit considered claims that the plaintiff framed as "flow[ing] from their performing [of] contracts," and even expressly sought damages—notwithstanding that damages are unavailable pursuant to the APA. *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). The Second Circuit decision was similar; the plaintiff expressly sought "an injunction directing the Army to execute the facility lease"—a thinly veiled request for specific performance. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374, 376–77 (2d Cir. 1999). Similarly, in the Third Circuit decision, the government brought suit "seeking rescission of the

contract"—yet another breach-of-contract remedy. *United States v. J & E Salvage Co.*, 55 F.3d 985, 987–89 (4th Cir. 1995). And in the Sixth Circuit decision, the plaintiffs asserted rights and regulatory violations that were wholly "depend[ent] upon whether *contracts* with [the Postal Service] afford[ed] such a right." *B & B Trucking, Inc. v. U.S. Postal Serv.*, 406 F.3d 766, 769–70 (6th Cir. 2005) (en banc). Each of these decisions followed the Tucker Act's *Megapulse* test with little to no discussion of the CDA's statutory text. Though doing so was imprecise, it was ultimately immaterial in those cases because each involved a claim that fell squarely within the two statute's common overlap: breach-of-contract actions. In each case, whether the implied-preclusion analysis was rooted in the Tucker Act or the CDA, the result was the same: dismissal of the plaintiffs' claims.

Here by contrast, this case implicates an area that the CDA covers but the Tucker Act does not; in other words, it falls outside of the Venn diagram's middle-ground overlap. We do not understand our sister circuits' decisions to require blind adherence to the *Megapulse* test in such a situation. Indeed, doing so would directly contradict the CDA's text. The CDA, unlike the Tucker Act, extends to "nonmonetary disputes," including requests for declaratory relief regarding "rights in *intangible* property." 28 U.S.C. § 1491(a)(2) (emphasis added). The *Megapulse* test, if applied in cases like this one, would risk rendering that aspect of the CDA a dead letter. Given materially similar facts to *Megapulse*, a plaintiff could always side-step the CDA because the plaintiff's asserted rights would be extracontractual (derived from patent, trademark, copyright, or trade secret law) and its remedies would be extracontractual (an injunction preventing misuse). Presented with a case in which the

*Megapulse* test would run roughshod over the CDA's text, we chose to follow the text. None of the decisions the dissent cites stands for the proposition that, if presented with a case like this, our sister circuits would do otherwise.

### D. Aero Can Seek Declaratory Relief in the Court of Federal Claims

Fourth, the dissent argues that our decision "could seriously impede the ability of plaintiffs to obtain injunctive relief." That may be correct as a factual matter—depending on how the Federal Circuit resolves the question it reserved in *Todd*, 656 F.3d at 1311 n.3 (reserving the question of whether the Court of Federal Claims may issue injunctive relief in addition to declaratory relief in CDA cases). But we are unsure what legal significance that observation has, since the government is free to waive its immunity only for certain forms of relief.

In any event, Aero could seek declaratory relief in a CDA action that would not be materially different from the injunctive relief it would be able to seek in an APA action. Indeed, "there is little practical difference between injunctive and declaratory relief." *California v. Grace Brethren Church*, 457 U.S. 393, 394 (1982). The primary difference is that declaratory relief "is a much milder form" of relief because it is not backed by the power of contempt. *Steffel v. Thompson*, 415 U.S. 452, 471 (1974) (quoting *Perez v. Ledesma*, 401 U.S. 82, 125–26 (1971) (Brennan, J., concurring in part)). But in suits against government officials and departments, we generally assume that they will comply with declaratory judgments. *See Poe v. Gerstein*, 417 U.S. 281, 281 (1974) (per curiam) ("[T]here was 'no allegation here and no proof that respondents would not, nor

can we assume that they will not, acquiesce in the [declaratory judgment] decision . . . .'" (citation omitted)).

## E. We Lack Jurisdiction to Consider the Government's Signature-Based Argument

Finally, the dissent expressed concern that "the Government—while vigorously arguing for CDA preclusion—also argues that the DRA is invalid and unenforceable on the grounds that it was not signed by a 'contracting' officer." We share the dissent's concern that the government appears to have taken a heads-I-win, tails-you-lose approach to arguing this appeal. We also note that in the two pages the government dedicates to its signature-based argument, it cites no CDA-specific precedent for its novel argument that technical non-compliance with a contracting regulation would vitiate a CDA cause of action even if an agreement is otherwise an "express or implied contract." 41 U.S.C. § 7102(a). That said, we do not ultimately resolve USAF's signature-based argument because we lack jurisdiction over it. USAF raised it as a Rule 12(b)(6) failure-to-state-a-claim argument, not a Rule 12(b)(1) lack-of-subject-matter-jurisdiction argument. Because we affirmed the district court's dismissal for a lack of subject-matter jurisdiction, we cannot proceed to reach this merits argument.[6]

---

[6] Our determination we lack jurisdiction to decide whether the DRA is a valid contract is fully compatible with our finding that the DRA qualifies as the requisite procurement contract needed to give rise to CDA jurisdiction. Contrary to the dissent's argument, the threshold jurisdictional question of whether a procurement contract is at issue in the dispute for the purpose of establishing CDA jurisdiction has no bearing on the merits-based question of whether that procurement

**CONCLUSION**

For the foregoing reasons, the district court's dismissal for lack of subject-matter jurisdiction is **AFFIRMED**.

---

COLLINS, Circuit Judge, dissenting:

Plaintiffs filed this suit under § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, seeking injunctive and declaratory relief against Defendants United States Air Force and United States Air National Guard based on Defendants' alleged misuse of Plaintiffs' intellectual property. The majority affirms the district court's dismissal of this action for lack of subject matter jurisdiction, holding that the Contract Disputes Act ("CDA") "impliedly forbids" Plaintiffs from bringing an APA action in federal district court. But the CDA does not impliedly forbid reliance on the APA where, as here, Plaintiffs' claims and relief are based, *not* on a Government contract, but rather on Plaintiffs' independent statutory rights under the Trade Secrets Act. The majority's contrary decision misconstrues the CDA, contravenes Ninth Circuit precedent, creates a split with four other circuits, and undermines the ability of contractors to obtain injunctive relief in federal court against Government violation of their statutory rights. Accordingly, I respectfully dissent.

**I**

The intellectual property at issue in this case relates to the Mobile Airborne Firefighting System ("MAFFS"),

---

contract is valid and enforceable. The dissent's criticism unfortunately collapses the crucial distinction between jurisdiction and merits.

which is fire-retardant tank system used to convert cargo planes into fire-fighting aircraft.  From about 1980 to 2000, Aero Union, a separate company from Plaintiffs, developed the original MAFFS through its own privately funded research and development.  In 2000, Aero Union contracted with the U.S. Forest Service ("USFS") to develop an updated MAFFS prototype, called "MAFFS II."  MAFFS II relied significantly on Aero Union's independently developed intellectual property, which Plaintiffs refer to as the "Pre-MAFFS II Proprietary Data."  Under the terms of the 2000 contract, Aero Union retained ownership of the Pre-MAFFS II Proprietary Data, subject to the USFS's limited use rights.  The contract terminated in 2012.

Following the termination of the 2000 contract, Plaintiffs purchased Aero Union's intellectual property, including the Pre-MAFFS II Proprietary Data, in a foreclosure sale.  To support the USFS's ongoing use of MAFFS II, Plaintiffs executed a Data Rights Agreement ("DRA") in 2014, which provided that the USFS "shall have unlimited rights to view and use the data required for the continued operation and maintenance of the [MAFFS II] product."  The DRA also reaffirmed, however, that the "Pre-MAFFS II Proprietary Data, and the technical data produced or specifically used or related to the [MAFFS II system] developed pursuant to [the 2000] contract shall remain the property of [Plaintiffs] (as the purchaser of assets of Aero [Union] . . . )."  Pursuant to the DRA, Plaintiffs provided the USFS with a hard drive containing Pre-MAFFS II Proprietary Data.  The USFS subsequently delivered that hard drive to Defendants, which developed a competing system to market internationally without Plaintiffs' consent.

Plaintiffs then sued Defendants (but not the USFS) under the APA, challenging Defendants' unlawful use of the

MAFFS data.  The district court dismissed Plaintiffs' claims for lack of subject matter jurisdiction, holding that any such claims had to be brought before the Court of Federal Claims ("CFC").  Plaintiffs timely appealed.

## II

As a general matter, no suit may be brought against the United States unless it has waived its sovereign immunity. *See Esquivel v. United States*, 21 F.4th 565, 572 (9th Cir. 2021).  The APA provides a limited waiver of sovereign immunity that allows plaintiffs who have "suffer[ed] legal wrong because of agency action" to file suit against the United States in federal district court.  5 U.S.C. § 702.[1]  To maintain such a suit, plaintiffs generally must satisfy three conditions: (1) they must "seek[] relief other than money damages," *id*.; (2) they must have "no other adequate remedy," *id*. § 704; and (3) the relief sought must not be "expressly or impliedly forbid[den]" by "any other statute that grants consent to suit," *id*. § 702.  *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645–46 (9th Cir. 1998).  The majority holds that the third requirement is not met here, because, in its view, exclusive jurisdiction over Plaintiffs' assertedly contract-related claim rests in the CFC. I disagree.  There are two grants of jurisdiction to the CFC that are potentially relevant here, but neither impliedly forbids this suit.

---

[1] As we have recognized, the APA supplies the cause of action and the waiver of sovereign immunity, but the APA is not itself "an independent basis for subject matter jurisdiction in the district courts."  *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) (citing *California v. Sanders*, 430 U.S. 99, 105 (1977)).  Rather, jurisdiction in APA cases rests on 28 U.S.C. § 1331.  *See Allen v. Milas*, 896 F.3d 1094, 1099 (9th Cir. 2018).

## A

First, the Tucker Act grants the CFC jurisdiction over, *inter alia*, "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  Applying long-settled law, I conclude that the Tucker Act does not impliedly forbid this suit.

Because the Tucker Act authorizes the CFC to grant "equitable relief" only "in limited circumstances," the general rule is that "the Tucker Act does not permit the [CFC] to grant equitable or declaratory relief in a contract dispute case." *North Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (*North Star I*).[2]  We have held that, because "the Tucker Act 'impliedly forbids' declaratory and injunctive relief" in suits founded on Government contracts, it "precludes" invocation of the waiver of sovereign immunity in § 702 of the APA, which applies only to equitable relief.  *North Side Lumber*, 753 F.2d at 1485; *see also North Star I*, 9 F.3d at 1432. However, because the Tucker Act's relevant grant of jurisdiction is limited to claims "founded . . . upon any express or implied contract," it does not bar invocation of the

---

[2] Subject to certain exceptions, the federal district courts also exercise concurrent jurisdiction with the CFC over such contract-based actions against the United States, but only if the amount claimed does not exceed $10,000.  *See* 28 U.S.C. § 1346(a)(2) (sometimes called the "Little Tucker Act").  The district courts' limited concurrent jurisdiction over contract-based claims under $10,000 has been similarly construed as generally precluding nonmonetary relief on such claims.  *See North Star I*, 9 F.3d at 1432; *North Side Lumber Co. v. Block¸* 753 F.2d 1482, 1485 (9th Cir. 1985).

APA's waiver of sovereign immunity if the claim is *not* "founded upon" a contract.

In determining whether a claim is "founded upon" a contract within the meaning of the Tucker Act—and thus impliedly forbidden to be asserted under the APA—we have long applied the test set forth by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). As we have explained, that test requires us to determine whether the suit is "'at its essence' a contract action" by considering both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *North Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994) (*North Star II*) (quoting *Megapulse*, 672 F.2d at 968). Here, consideration of these factors confirms that Plaintiffs' claim is not "founded upon" a contract with the Government.

In considering how the *Megapulse* test applies here, I begin by reviewing the D.C. Circuit's decision in that case, which involved somewhat similar facts. In *Megapulse*, the plaintiff contractor filed suit in the district court to enjoin the Government from disclosing data that the plaintiff had independently developed prior to executing its first contract with the Government and prior to its delivery of the data to the Government under that contract. *Megapulse*, 672 F.2d at 961–62. The plaintiff alleged that disclosure of the data by the Government to other entities would violate the Trade Secrets Act, *see* 18 U.S.C. § 1905, but the Government argued that its contemplated disclosures were authorized by its contract with the plaintiff. *Megapulse*, 672 F.2d at 962, 966. The D.C. Circuit held that the plaintiff's claims for relief were not impliedly forbidden by the Tucker Act and that suit was therefore properly brought under the APA in federal district court. In reaching this conclusion, the D.C. Circuit considered both the source of the plaintiff's rights

and the relief sought, and it ultimately held that the plaintiffs' suit did not involve "'disguised' contract claims." *Id*. at 969.

In determining the source of the plaintiff's rights, *Megapulse* emphasized that the plaintiff there had carefully limited its claim to a discrete set of documents reflecting "proprietary technology developed *prior*" to its contracts with the Government and that the plaintiff relied solely on the theory that the Government was violating its property rights and the Trade Secrets Act. *Megapulse*, 672 F.2d at 969 (simplified). As the court explained, it was "actually the Government, and not Megapulse, which is relying on the contract" by claiming in defense that its actions were authorized under the contract. *Id*. The court specifically rejected the Government's argument that "the mere existence of such contract-related issues must convert this action to one based on the contract." *Id*. As to the relief sought, the court noted that Megapulse did not seek "monetary damages," nor could its claim be "properly characterized as one for specific performance" of any contract. *Id*. On the latter score, the court expressly rejected the Government's argument that the existence of parallel contractual duties that matched the Government's statutory obligations should be sufficient to convert Megapulse's claim into one for specific performance of a contract. *Id*. at 971.

Under *Megapulse*, this is an easy case. Here, as in *Megapulse*, Plaintiffs have carefully limited the factual predicate of their claims to proprietary data that preceded Aero Union's first contract with the Government in 2000. Here, as in *Megapulse*, Plaintiffs are relying upon their rights under trade secret law, including the Trade Secrets Act, and it is the Government that is raising contractual issues as a

defense.  Thus, as a factual and legal matter, "the source of the rights upon which the plaintiff bases its claims" are independent of any contract with the Government.  *North Star II*, 14 F.3d at 37.  Moreover, as in *Megapulse*, Plaintiffs are not seeking money damages, nor are they seeking any contract-based remedies.  *Cf. id.* at 37–38 (holding that plaintiff seeking reformation was asserting a contract-based claim under the *Megapulse* test).  Instead, they seek an "injunction[] against activities violative of a statutory duty." *Megapulse*, 672 F.2d at 971; *see also Crowley Govt. Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108–10 (D.C. Cir. 2022) (holding that district court had jurisdiction under *Megapulse* where the plaintiff "'does not claim a breach of contract, it has limited its request for relief' in district court to the enforcement of the [agency's] statutory obligations, 'it seeks no monetary damages against the United States, and its claim is not properly characterized as one for specific performance.'" (quoting *Megapulse*, 672 F.2d at 969)).

Because, under the *Megapulse* test, Plaintiffs' claims are not "founded . . . upon any express or implied contract," 28 U.S.C. § 1491(a)(1), the Tucker Act does not impliedly forbid invocation of the APA.

## B

The second potentially relevant grant of jurisdiction to the CFC is the CDA.  In my view, the CDA does not impliedly forbid Plaintiff's claims here.

## 1

The CDA, enacted in 1978, has since been codified as Chapter 71 of title 41 of the United States Code.  *See* 41 U.S.C. §§ 7101–7109.  By its terms, the CDA applies only to "any express or implied contract . . . made by an executive

agency for" (1) the "procurement of property, other than real property in being"; (2) the "procurement of services"; (3) the "procurement of construction, alteration, repair, or maintenance of real property"; or (4) the "disposal of personal property." *Id*. § 7102(a)(1)–(4). The CDA establishes an administrative process under which any "claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." *Id*. § 7103(a)(1). The contracting officer must then issue a written decision, *see id*. § 7103(a)(3), (d), and if it is adverse to the contractor, then the contractor can either appeal to the appropriate agency board of contract appeals, *see id*. § 7104(a), or "bring an action directly on the claim" in the CFC, *id*. § 7104(b)(1). An adverse decision in either forum may be reviewed by the Federal Circuit. *See id*. § 7107(a)(1); 28 U.S.C. § 1295(a)(3).

The corresponding provision of the judicial code that confers jurisdiction on the CFC to adjudicate an action filed by a contractor under § 7104(b)(1) states:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the

> contracting officer has been issued under
> section 6 of that Act [41 U.S.C. § 7103].

28 U.S.C. § 1491(a)(2). The majority describes this provision as conferring "exclusive" jurisdiction in the CFC, *see* Opin. at 17, but that is not exactly correct. As noted earlier, there are two possible routes for review of a contracting officer's determination of a claim under the CDA, and the other option (review by an agency board of contract appeals, followed by review in the Federal Circuit) bypasses the CFC altogether. To the extent that the CDA impliedly forbids invocation of the APA here, that is attributable, not so much to any "exclusive" jurisdiction of the CFC, but rather to the CDA's "mandatory administrative process for resolving contract disputes." *Menominee Indian Tribe v. United States*, 577 U.S. 250, 252 (2016). If the CDA applies here, then Plaintiffs were required to present their claim to the relevant contracting officer before invoking one of the CDA's two paths to judicial review. That would, in my view, impliedly forbid them from invoking the APA as an end-run around the CDA's administrative process and the specific methods of judicial review applicable to that process.

The question, then, is whether Plaintiffs were required to submit their claim in this case to a contracting officer in accordance with the CDA. As noted earlier, the CDA requires that any "claim by a contractor against the Federal Government *relating to a contract*" governed by the CDA "shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1) (emphasis added). And, generally speaking, the only contracts that are governed by the CDA are "procurement" contracts. *Id*. § 7102(a)(1)–(3). On that basis, I agree that, if Plaintiffs' "claim" here is one "relating"

to a procurement contract, then they were required to invoke the CDA's processes, and any resort to the APA as a substitute is impliedly forbidden.  5 U.S.C. § 702.

**2**

Whether this case may proceed in the district court thus turns on whether Plaintiffs' claim is one "relating to" a procurement contract within the meaning of § 7103(a)(1) of the CDA.  The majority concludes that the *Megapulse* test that is used for distinguishing between claims "founded upon" a contract in the Tucker Act context does not apply to the similar inquiry, in the CDA context, as to whether a claim "relat[es] to a contract."  *See* Opin., § II.  According to the majority, any cause of action that, broadly speaking, has "some relationship to the terms or performance" of a procurement contract is a claim "relating to a contract" for purposes of the CDA and therefore may not be the subject of a suit under § 702 of the APA.  *See* Opin. at 9 (quoting *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011)).  And that remains true, according to the majority, even if the only "relationship" between the plaintiff's claims and the procurement contract is that the Government has invoked contract-based *defenses* to the plaintiff's non-contract-based claims.  *See* Opin. at 11–12, 16–20.  For multiple reasons, the majority is wrong in holding that the *Megapulse* test is limited to the Tucker Act context and does not apply to the CDA.

First, the majority overlooks the meaning, in context, of the entire relevant phrase in the CDA, and in doing so the majority misreads the *Todd* case on which it primarily relies.  In describing what must be submitted to a contracting officer, § 7103(a)(1) refers to a "*claim* by a contractor against the Federal Government *relating to a contract*."  41

U.S.C. § 7103(a)(1) (emphasis added). As the Federal Circuit noted in *Todd*, the CDA does not define the crucial word "claim." 656 F.3d at 1311. *Todd* held, however, that under the Federal Circuit's prior decision in *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563 (Fed. Cir. 1995), "the definition of the term 'claim' in the FAR [Federal Acquisition Regulations] governs." 656 F.3d at 1311. As *Todd* explained, "[t]he FAR defines 'claim' as 'a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.'" *Id*. (emphasis omitted) (quoting 48 C.F.R. § 2.101). The types of "claims" governed by the CDA are thus limited to those seeking "*relief arising under* or *relating to* the contract." *Id*. (emphasis added). This focus on contract-based rights and contract-related relief is not materially different from the *Megapulse* test, which requires consideration of the same factors. *See Megapulse*, 672 F.2d at 968. Moreover, the "claim" at issue in *Todd*—which challenged the "quality of the contractor's performance *under the terms of the contract*," *Todd*, 656 F.3d at 1313 (emphasis added)— readily qualifies as "at its essence a contract claim" under *Megapulse*, 672 F.2d at 967.

Second, even setting aside *Todd*'s particular definition of a "claim," the majority's analysis still fails. According to the majority, a contractor's "claim" "relat[es] to" a contract if the Government's *defenses* to that claim relate to the contract. *See* Opin. at 11–12. The majority cites no authority that supports this rewriting of the statute, which focuses on the "claim" asserted and not the defenses raised against it. The majority notes that Plaintiffs cannot prevail on their claim without defeating those defenses and that

Plaintiffs' complaint itself anticipates those defenses. *See* Opin. at 11–12. But that does not erase the distinction between a claim and a defense, *cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (holding that the rule that a federal defense does not suffice to show that a claim arises under federal law applies "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue"), and the CDA requires that the *claim*—not an anticipated defense—relate to the contract. 41 U.S.C. § 7103(a)(1). The *Megapulse* test honors that distinction between claims and defenses, because *Megapulse* specifically held that the Government's decision to raise a contract-based defense does not make a plaintiff's claim a contract claim. 672 F.2d at 969.[3]

Third, the majority's expansive reading of the CDA ignores our prior caselaw holding that the CDA's preclusive effect on the availability of other jurisdictional statutes should be "narrowly" construed. *Concrete Tie, Inc. v. Liberty Constr., Inc.* (*In re Liberty Constr.*), 9 F.3d 800, 801 (9th Cir. 1993). In *Liberty Construction*, we invoked that narrow-construction rule in rejecting the Government's argument that our construction of the statute "vest[ing] jurisdiction in the district court over claims against the SBA

---

[3] The majority insists that this distinction between claims and defenses is an artifact of the jurisprudence governing 28 U.S.C. § 1331 and does not apply outside that context. *See* Opin. at 19–20. But the provision of the CDA that the majority says impliedly forbids invocation of the APA applies, by its terms, only if the "claim" is one "arising under section 7104(b)(1) of title 41," 28 U.S.C. § 1491(a)(2), and § 7104(b)(1) in turn authorizes an "action directly on the claim" raised by the contractor. The statute's focus here is on the claim asserted by the contractor and not the defenses asserted by the Government.

[Small Business Administration]" had been "implicitly overruled" by the CDA.  *Id*.; *see also Wright v. U.S. Postal Serv.*, 29 F.3d 1426, 1429 (9th Cir. 1994) (expressly rejecting the view that "the CDA 'pre-empt[s] the entire field of government contract remedies'").[4]

Fourth, the majority creates a circuit split with at least four circuits that expressly apply *Megapulse* in assessing whether the CDA impliedly forbids reliance on the APA. *See B & B Trucking, Inc. v. U.S. Postal Serv.*, 406 F.3d 766, 768 (6th Cir. 2005) (en banc) ("The CDA bars district court jurisdiction if the court determines that a plaintiff's claims against a government agency are 'essentially contractual' in nature.  'The classification of a particular action as one which is or is not [essentially contractual] depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate).'" (quoting *Megapulse*, 672 F.2d at 968) (other internal citations omitted)); *A&S Council Oil Co. v. Lader*, 56 F.3d 234, 239–40 (D.C. Cir. 1995) (applying *Megapulse* test in determining whether a claim is one "relating to a contract" within the meaning of the CDA); *Up State Fed. Credit Union v. Walker*, 198 F.3d 372,  374–76 (2d Cir. 1999) (applying *Megapulse* in determining whether claims were contract

---

[4] Indeed, we have gone so far as to hold that the CDA does not bar invoking other bases of jurisdiction even in the context of claims that would qualify as contract-based under the *Megapulse* test.  *See*, *e.g.*, *Wright*, 29 F.3d at 1429; *Liberty Construction*, 9 F.3d at 801–02; *North Side Lumber*, 753 F.2d at 1485–86.  That further rule has provoked a split with the Second Circuit.  *See Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 401–02 (2d Cir. 2017) (holding that the claim at issue was a contract claim under *Megapulse* and that the CDA was the exclusive vehicle for relief, expressly rejecting contrary Ninth Circuit authority). Because this case does not involve a contract claim within the meaning of *Megapulse*, this case does not implicate that distinct split of authority.

claims subject to the CDA); *United States v. J & E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995) (same). Although the majority tries to distinguish these cases on their specific facts, *see* Opin. at 23–24, it cannot deny that these other circuit decisions explicitly apply to the CDA the *Megapulse* test that the majority rejects.

Fifth, the majority's holding could seriously impede the ability of plaintiffs to obtain injunctive relief against Government misconduct, even for statutory violations such as those at issue here, if the plaintiffs' claims can be said, in some broad sense, to "relate" to a contract the plaintiff assertedly has with the Government. The majority dismisses this concern, even while acknowledging that the Federal Circuit itself expressly declined to decide in *Todd* whether the CFC had authority to issue injunctive relief in that case. *See* Opin. at 25 (citing 656 F.3d at 1311 n.3). The majority hopes that declaratory relief—which the majority concedes could not be enforced by contempt authority—would be sufficient. *Id*. But if not, well, then too bad, according to the majority, because "the government is free to waive its immunity only for certain forms of relief." *Id*. The majority's overbroad rule threatens to seriously thwart the critical role served by APA § 702's waiver of sovereign immunity in cases seeking injunctive relief against the Government. *See Transohio Sav. Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 611–12 (D.C. Cir. 1992) ("[W]e are mindful of the warning that federal courts not subvert the congressional objectives underlying the enactment of § 702 of the APA by allowing the government to give an overly expansive scope to the notion of claims 'founded upon' a contract" (simplified)).

For all of these reasons, the majority seriously errs in rejecting the *Megapulse* test in assessing whether the CDA

impliedly forbids a claim for injunctive relief under § 702 of the APA. Because I would apply *Megapulse* in assessing the limits of the CDA, I necessarily conclude that Plaintiffs' claims are not impliedly forbidden by the CDA.

## III

Finally, I cannot let pass without comment an additional troubling feature of this case that the majority brushes aside. In finding that the CDA impliedly forbids invocation of the APA here, the majority holds that the DRA qualifies as a procurement contract within the meaning of the CDA. *See* Opin. § II(b). But the majority nonetheless declines to address the fact that the Government—while vigorously arguing for CDA preclusion—also argues that the DRA is invalid and unenforceable on the grounds that it was not signed by a "contracting" officer. The extraordinary result of the majority's decision is that Plaintiffs' loss of their ability to file a district court action seeking injunctive relief to enforce their statutory rights against the Government is attributable to the Government's assertion of a contract-based *defense* under a contract that the Government simultaneously contends is *invalid*. This cannot be right. *See Crewzers Fire Crew Trans., Inc. v. United States*, 741 F.3d 1380, 1382 & n.3 (Fed. Cir. 2014) (holding that the plaintiff's contract with the Government was unenforceable and therefore could not "be used to invoke" the jurisdiction of the CFC under the Tucker Act or the CDA); *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1060–61 (Fed. Cir. 2002) (holding that, because the "Tender Agreement" upon which CDA jurisdiction was predicated was not a valid

contract, the CFC properly concluded that it lacked jurisdiction under the CDA).[5]

## IV

For the reasons I have explained, neither the Tucker Act nor the CDA impliedly forbid invocation of the APA here. Accordingly, the district court erred in dismissing this action for lack of jurisdiction, and its judgment should be reversed. I respectfully dissent.

---

[5] The majority protests that, in addressing whether there is jurisdiction under the CDA, we lack jurisdiction to decide whether the DRA is a valid contract. *See* Opin. at 26. That contention is contrary to the Federal Circuit's decisions in *Crewzers* and *Ridge Runner*, and it also contradicts the majority's assertion that the DRA qualifies as the requisite procurement contract needed to give rise to CDA jurisdiction. It is apparently the majority's view that the Government may invoke the CDA—and deprive a plaintiff of its ability to assert an APA injunctive claim—merely by showing that the plaintiff is asserting a claim as to which the Government has a defense that is related to a *putative* agreement that the Government contends is not actually a valid contract. Once again, that cannot be right.